369 Mass. 709                                          709

Springfield Y Trust *v.* Executive Dir. of the Mass. Housing Fin. Agency.

SPRINGFIELD Y TRUST[1] *vs.* EXECUTIVE DIRECTOR OF THE
MASSACHUSETTS HOUSING FINANCE AGENCY
& others.[2]

Suffolk.   January 7, 1976. — February 11, 1976.

Present: REARDON, QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Massachusetts Housing Finance Agency.   Environmental Affairs.
Words,* "Commenced."

The Massachusetts Housing Finance Agency was not required to pub-
lish an environmental impact report pursuant to § 62 of G. L.
c. 30, the Massachusetts Environmental Policy Act, which went
into effect on July 1, 1973, with regard to a housing project it was
financing where the commencement of the project was properly
considered to have occurred on July 11, 1972, upon the agency's
issuance of a letter of commitment to lend money to the developers
of the project.   [711-714]

PETITION for a writ of mandamus filed in the Superior
Court on February 25, 1974.

The case was heard by *McNaught,* J.

After review was sought in the Appeals Court, the
Supreme Judicial Court, on its own initiative, ordered
direct appellate review.

*Bruce F. Smith (Alan S. Geismer, Jr.,* with him) for
Springfield Y Trust.

*Albert F. Cullen, Jr.,* for William J. White.

*Kenneth A. Cohen* for Michael B. Malvin & another.

KAPLAN, J.   One Charles H. Gould, as trustee of a
real estate trust called the Marjorie Trust, petitioned in
February, 1974, for mandamus to compel the respondent
William J. White, as executive director of the Massa-

---

[1] Substituted as petitioner-appellant as indicated in the text.

[2] The other respondents, later added, are named in the text below.

chusetts Housing Finance Agency (MHFA), to carry out certain statutory "environmental" obligations including, notably, the publishing of an environmental impact report (see G. L. c. 30, § 62) regarding the Chestnut Park housing project in Springfield which MHFA was financing. The petitioner sought a temporary restraining order enjoining the further advancement of funds for the project. This application was opposed by the respondent and denied by a judge of the Superior Court. The petitioner did not seek review of the denial. After sundry preliminaries which need not be detailed, the petitioner was permitted to file an "amended petition for writ of mandamus" naming as respondents White and other members of MHFA; Michael B. Malvin and Robert S. Bowditch, Jr., general partners of Chestnut Park Associates, a limited partnership, constituting the "developers" of the project; and George H. Macomber Company, Inc., and Daniel O'Connell's Sons, Inc., the building contractors. On July 1, 1974, White and the developers moved to dismiss the amended petition (with the coming in of the new rules, more properly called a "complaint") under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), for failure to state a claim. The motion was granted and judgment entered on September 12, 1974, dismissing the amended complaint. Appeal to the Appeals Court on the part of the petitioner Gould followed, and we ordered a transfer to this court under G. L. c. 211A, § 10 (A). On the appeal counsel represented that Springfield Y Trust had succeeded to the interest of the Marjorie Trust and prayed a substitution under Mass. R. A. P. 30 (b), 365 Mass. 878 (1974), which we hereby grant. We affirm the judgment.

The parties accept that the allegations of the amended complaint are to be read together with the undisputed statements of basic fact set out in the affidavit (with annexes) of the respondent-appellee White submitted in opposition to the application for the temporary restraining order. The following appears.

369 Mass. 709                                    711

Springfield Y Trust *v.* Executive Dir. of the Mass. Housing Fin. Agency.

The substituted petitioner-appellant Springfield Y Trust owns premises abutting on the Chestnut Park project. This project is located in the central business district of Springfield and was planned to consist of three commercial-residential buildings (rising thirty-three, seventeen, and nine stories), with a fourth garage-office building (five stories). Some 456 rental units were contemplated, of which about 257 were destined for low and moderate income families or individuals. To make the project financially feasible, special low-interest loans, secured by construction and continuing mortgages, would be required and would be furnished by MHFA, an independent State authority serving as a lending institution (see St. 1966, c. 708, as amended; *Massachusetts Housing Fin. Agency* v. *New England Merchants Nat'l Bank,* 356 Mass. 202 [1969]).

The critical events in the initiation and carrying out of the lending operation were as follows. On June 29, 1972, MHFA received an application from the developers for a construction loan of $17,319,640. On July 11, 1972, MHFA issued to the developers a letter of commitment in that amount, agreed to by the developers on July 23, 1972. On February 6, 1973, a further letter of commitment was issued on the same terms, but raising the amount to $18,129,985 because of increased costs; this was agreed to by the developers on February 12, 1973. On June 26, 1973, and July 2, 1973, the developers entered into contracts with the building contractors and architects, respectively, and on July 18, 1973, building permits issued from the Springfield authorities. Between July 19 and July 30, 1973, the necessary final documents covering the loans and related matters were completed and recorded. First moneys were advanced by MHFA to the developers on July 31, 1973, and by the date of the White affidavit (March 5, 1974) $2,900,000 had been advanced. (By then, it appears, work had begun on the foundation of the seventeen-story building adjacent to the plaintiff's premises.)

With respect to environmental obligations, MHFA made a "determination" under G. L. c. 30, § 61, on July 3, 1973, that the project would cause no damage to the environment.[3] MHFA took no action under § 62. Sections 61 and 62 are described in the margin.[4] It is to be noted that the former went into effect on December 31, 1972, the latter on July 1, 1973. St. 1972, c. 781, § 3.

The gravamen of the amended complaint was in substance that the "work, project, or activity" involved here had not "commence[d]" before July 1, 1973; consequently, under the terms of § 62,[5] an environmental impact

---

[3] The United States Department of Housing and Urban Development (HUD), which evidently has an interest, had made a determination on June 11, 1973, that the project would have no significant adverse impact on the quality of the human environment.

[4] As summarized in *Marlow* v. *New Bedford, ante,* 501, 505 (1976): "General Laws c. 30, § 61, establishes an official policy of environmental protection in the Commonwealth and requires that various enumerated categories of State instrumentalities use 'all practicable means and measures to minimize damage to the environment.' General Laws c. 30, § 62, prescribes a procedure for thorough consideration of potential environmental impact through preparation of a draft and a final EIR [environmental impact report] and through submissions of these EIR's to interested State agencies and the public. Specifically, G. L. c. 30, § 62, provides that '[n]o agency, department, board, commission, or authority of the commonwealth or any authority of any political subdivision thereof shall commence any work, project, or activity which may cause damage to the environment until sixty days after it has published a final environmental impact report . . . or until sixty days after a public hearing on said report . . . .' The final EIR supplies the data for the required § 61 determination that the project, as planned, minimizes damage to the environment and for evaluation of the determination by a reviewing court."

[5] Section 62 provides in part: "No agency, department, board, commission, or authority of the commonwealth or any authority of any political subdivision thereof shall commence any work, project, or activity which may cause damage to the environment until sixty days after it has published a final environmental impact report in accordance with the provision of this section or until sixty days after

report was due from MHFA with consequences as stated there, and MHFA was also required to take action under § 61. The petitioner-appellant would relate "commencement" to the dates of execution of the final documents in July, 1973, or perhaps to the advancement of substantial loan money. On the other hand, MHFA says that the date of the letter of commitment, July 11, 1972, marks commencement of the "work, project, or activity," so that no report was required under § 62, nor was any action required under § 61 (the "determination" of July 3, 1973, was thus made voluntarily and not under statutory compulsion).[6]

We need not review our recent decisions on "commencement" for purposes of the environmental laws. They reflect a common-sense appreciation of when the stage of tentative planning passes to the stage of an engagement to act. See *Secretary of Environmental Affairs* v. *Massachusetts Port Authority,* 366 Mass. 755, 757-767 (1975); *Marlow* v. *New Bedford, supra* at 508-511. The thought was expressed thus in regulations of the Executive Office of Environmental Affairs promulgated under § 62 on July 6, 1973: "Projects shall be deemed to have commenced when the agency has undertaken a continuous program of action or construction or has entered into a binding agreement or other obligation to undertake and complete a continuous program of action or construction." (Reg. 13)[7] We

---

a public hearing on said report, provided that research, planning, design and other preliminary work necessary to describe and evaluate such project for the purposes of this section may be undertaken."

[6] The interrelation between § 61 and § 62 is developed in *Boston* v. *Massachusetts Port Authority,* 364 Mass. 639, 658-665 (1974).

[7] The same regulation directs secretaries of executive offices further to define "commenced" by regulations which shall "specifically identify a uniform phase or point, the completion or attainment of which commits the agency to the ultimate completion of a specifically planned activity." See *Secretary of Environmental Affairs* v. *Massachusetts Port Authority,* 366 Mass. at 762.

should add that commencement is a functional concept: the question whether a project has been commenced by a given State agency must be seen in terms of what the particular agency is charged with doing, what role it plays in the project as a whole. MHFA is a lender. On July 11, 1972, it offered to enter into a firm undertaking to lend, and the offer was accepted by the borrowers within the ninety days allowed. The letter of commitment is a document drawn with manifest care. It is detailed in its terms as to how the money is to be advanced and repaid, with stipulations as to interest and other matters. The "commitment" is stated to be subject to the borrowers' compliance with listed "conditions and requirements, to the complete satisfaction of [MFHA]." Then follow twenty such provisions, some stemming from MFHA's basic statute. These comprise contingencies the occurrence of which might abort the transaction. The letter is nevertheless a solid commercial engagement on both sides. It is not dissimilar to other loan commitments, and is sufficient to qualify as commencement of MHFA's lending activity. See *Dubin Weston, Inc.* v. *Louis Capano & Sons, Inc.,* 394 F. Supp. 146 (D. Del. 1975); *Zelazny* v. *Pilgrim Funding Corp.,* 41 Misc. 2d 176 (N.Y. Dist. Ct. 1963).

In this view there is no reason to pass on other questions argued in the briefs: whether this was a proper case for mandamus or similar relief (see G. L. c. 249, § 5, as appearing in St. 1973, c. 1114, § 291); whether the petitioner was bound to proceed by a ten taxpayers' suit (see G. L. c. 214, § 7A, formerly c. 214, § 10A); whether the petitioner was barred by laches (temporary relief having been denied and no review sought); or whether the case was mooted by the fact that very considerable advances had been made by MHFA to the developers by the time the appeal was heard.

*Judgment affirmed.*