CHARING CROSS CORPORATION vs. COMFED MORTGAGE CO., INC. No. 87-302. December 21, 1987. *Contract*, Loan. *Evidence*, Extrinsic affecting writing. *Mortgage*, Real estate, Insurance, Loan Commitment. *Practice, Civil*, Summary judgment.

This dispute arises out of an agreement, constituting a loan commitment, between the plaintiff, a real estate developer, and the defendant, a lending institution. The agreement was completed on April 26, 1985, and was designed to provide financing to purchasers of condominium units in a development owned by the plaintiff called "Keith Academy." In its amended complaint the plaintiff claimed that the defendant had committed a breach of the agreement by failing to secure private mortgage insurance for fifty-six end loans (Count I) and had violated an implied covenant of good faith and fair dealing by failing to inform the plaintiff that it had not obtained private mortgage insurance (Count II). The amended complaint further alleged that private mortgage insurance was available when the commitment agreement was signed but thereafter became unavailable, thus either rendering performance of the agreement impossible (Count III), or rendering the agreement unenforceable because its purpose had been frustrated (Count IV). Finally, the plaintiff alleged that the defendant's actions violated G. L. c. 93A, §§ 2 and 11 (Count V). The plaintiff sought the return of its $92,000 commitment fee together with interest, and a trebling of any actual damages awarded (plus attorney's fees and costs), if a violation of G. L. c. 93A were to be found.

A judge of the Superior Court allowed the defendant's motion for summary judgment, Mass.R.Civ.P. 56(b), 365 Mass. 824 (1974), and judgment was entered dismissing the action. The plaintiff appealed to this court. We affirm the judgment.

The following facts furnish background. The Keith Academy condominium project was one of many real estate projects owned by the plaintiff, an experienced real estate developer doing business throughout eastern Massachusetts. In order to "enhance the marketability of the [Keith Academy] units and in other ways serve as a business purpose," the plaintiff sought to obtain an end loans commitment from the defendant.

After negotiations, the defendant offered, in a ten page letter dated April 22, 1985, to reserve $4,600,000 until May 31, 1986, for permanent end loans. The plaintiff accepted the defendant's commitment on April 26, 1985, and paid a $92,000 commitment fee, which represented 2% of the $4,600,000 reserved by the defendant. The commitment, by its terms, expired on May 31, 1986.

By October, 1985, a private mortgage insurance company apparently had issued a commitment, extending through February, 1986, to insure twenty units in the project. This allowed the plaintiff, as one of its affidavits puts it, to "provide 90% financing for only 20 of the 56 units." During the thirteen-month life of the defendant's commitment, private mortgage insurance also was available for less than 90% end loans. None of the plaintiff's purchasers filed an application for loans with the defendant during the term of the commitment. Instead, about two months before the stated expiration date of the commitment, the plaintiff commenced this lawsuit.

1. The plaintiff's action is based upon a written agreement made between business entities experienced in their respective fields of real estate development and mortgage lending. The agreement, by its express terms, is a fully integrated document which recites that it cannot be modified except in writing. The agreement, therefore, is subject to the usual rule that the rights and liabilities of the parties are governed by the terms of their writing, the construction of which is, in the first instance, a matter for the court. See *Ceco Corp.* v. *Bennett*, 355 Mass. 791, 792 (1969). *Creed* v. *Apog*, 6 Mass. App. Ct. 365, 368 (1978). In performing that task, the judge can look to the circumstances of the agreement's execution to ascertain whether it is uncertain or equivocal in any essential aspects. *Robert Indus. Inc.* v. *Spence*, 362 Mass. 751, 753-754 (1973). But if the language of the agreement remains reasonably clear and specific, it will not require or admit of extrinsic explanation, see *Robert Indus. Inc.* v. *Spence*, 362 Mass. at 754; *Johnson* v. *Worcester Business Dev. Corp.*, 1 Mass. App. Ct. 527, 529 (1973); *Sullivan Bros. Clothing Inc.* v. *North Dartmouth Joint Venture*, 3 Mass. App. Ct. 778, 778-779 (1975), and its proper interpretation is a matter of law for the judge. See *Tri-City Concrete Co.* v. *A.L.A. Constr. Co.*, 343 Mass. 425, 427 (1962); *Daley* v. *J.F. White Contr. Co.*, 347 Mass. 285, 288 (1964).

The plaintiff maintains that the agreement is ambiguous in two principal respects. First, the plaintiff argues that the agreement fails to specify clearly the extent to which the defendant was obligated to furnish 90% financing to all qualified purchasers. On this point, the plaintiff contends that the

$4,600,000 loan amount represents 90% of the total sell-out value of all fifty-six units, that it was known that all fifty-six units would be sold to investors, and that the defendant "was repeatedly informed that 90% financing would be needed for all of the units at Keith Academy in order to attract investor purchasers." Second, the plaintiff maintains that the agreement fails to indicate clearly the defendant's obligation to obtain the private mortgage insurance necessary for 90% financing of all fifty-six loans. The plaintiff contends, as one of its affidavits puts it, that it "was always led to believe that ComFed usually ensured the availability of private mortage insurance for purchasers such as the investors that would be purchasing units at Keith Academy". In the plaintiff's view, these ambiguities require a trial at which oral testimony and other evidence can be presented to ascertain the true meaning of the agreement on the two points described.

The agreement represents a financing contract (of considerable length) which spells out in detail the rights and obligations of the plaintiff and defendant. Such a commitment agreement represents "a document drawn with manifest care . . . detailed in its terms as to how the money is to be advanced and repaid, with stipulations as to interest and other matters." *Springfield Y Trust* v. *Executive Director of the Massachusetts Housing Fin. Agency*, 369 Mass. 709, 714 (1976). It is a "solid commercial agreement on both sides," and includes contingencies "which might abort the transaction." *Ibid.* See also *Coolidge Bank & Trust Co.* v. *First Ipswich Co.*, 9 Mass. App. Ct. 369, 371 (1980). By the banking business a loan commitment has been defined as "[a] binding pledge made by the lender to the borrower to make a loan usually at a stated rate within a given period of time for a given purpose subject to the compliance of the borrower with stated conditions." American Bankers Association, Banking Terminology 58 (1982).

Regardless of what may have been discussed between the plaintiff and defendant before the agreement was signed, the agreement is unambiguous on the first point argued by the plaintiff — the alleged obligation of the defendant to guarantee ninety percent financing for all loans. There is no such obligation.

The agreement specifies that the defendant "will reserve funds . . . for the purpose *of considering* permanent mortgage loan applications for [the plaintiff's] purchasers" (emphasis supplied). It also states that the "maximum loan to value ratio is 90%," and that a loan application will be considered upon a variety of criteria established by the Federal National Mortgage Association, all as set forth in great detail in the agreement. By tying the loan to value ratio to the lower of the sale price or appraisal, and to a purchaser's satisfaction of numerous preconditions, and by reserving the right to consider loans up to a maximum value of ninety percent, the possibility of the approval of less than ninety percent loans is clearly established as a matter within the defendant's business judgment.[1]

---

[1] Attention should also be paid to the requirement of the agreement which provides that mortgage applicants who make "larger down payments" on their units may

Furthermore, while the agreement provides that the defendant "will accept applications for non-owner occupied units up to a maximum of 100% of the units," it also provides that "[l]oans shall be committed to individual purchasers on either an owner occupied or non-owner occupied basis . . . in a manner acceptable to [the Federal National Mortgage Association]". Owner-occupied units would not customarily involve investor purchasers. This is an additional factor that cuts against the plaintiff's efforts to categorize the agreement as ambiguous. We think it would be extraordinary, given the discretion furnished the defendant by the agreement as to when and in what manner loans will be approved, to read the agreement as requiring 90% loans across the board to all purchasers. Such a construction would be at variance with the plain wording of the agreement.

We think the provisions of the agreement discussed above negate the plaintiff's first point,[2] and we conclude, after consideration of the plaintiff's arguments, that the agreement unambiguously provides that the defendant possessed discretion as to whether it would grant mortgage loans up to 90% for some or all of the fifty-six units.

2. We also think that the agreement does not obligate the defendant to obtain private mortgage insurance. Nowhere does the agreement state that the defendant will provide private mortgage insurance for each purchaser. The words "will be required for each loan," as used in the provision pertaining to that condition, strongly imply an obligation of the plaintiff. Furthermore, the private mortgage insurance term was contained among a long list of instructions and requirements governing the defendant's rights and the borrowers' obligations. These considerations satisfy us, upon the face of the agreement itself, that the plaintiff, or its purchasers, were the party or parties expected to furnish private mortgage insurance as a prerequisite to obtaining approval of final purchase money mortgages.

In addition, the plaintiff has failed to present sufficient admissible evidence which might support the alleged factual dispute. The affidavits of its two representatives both state that they were "led to believe" during negotiations that the defendant "usually" ensured the availability of private mortgage insurance. Vague statements of belief are insufficient in affidavits opposing summary judgment, and can be disregarded.[3] See *Stetson* v.

---

receive consideration for a higher expense to income ratio than the customary twenty-eight percent. The reference to "larger down payments", when considered with the maximum loan to value ratio of ninety percent, indicates that the agreement does not call for, or require, that every loan be a ninety percent loan.

[2] We do not attach significance to the fact that $4,600,000 was reserved for the loans, a sum which may have represented ninety percent of the total anticipated sale prices of the fifty-six units. As the defendant had the right to consider and possibly approve ninety percent loans for all the units, it would have been appropriate for it to insert the maximum possible total value of the loans in the commitment.

[3] Nor are we impressed with the plaintiff's reliance on the statement attributed to Allardice. There is nothing to establish that Allardice (who is described simply

*Selectmen of Carlisle*, 369 Mass. 755, 763 n.12 (1976); *Wagner* v. *Lectrox Corp.*, 4 Mass. App. Ct. 815 (1976); *Hartford Acc. & Indem. Co.* v. *Mills Roofing & Sheet Metal, Inc.*, 11 Mass. App. Ct. 998, 999 (1981); *Malapanis* v. *Shirazi*, 21 Mass. App. Ct. 378, 385 n.7 (1986). Because the agreement does not require the defendant to provide mortgage insurance, and because the plaintiff has not provided any competent evidence to the contrary, we conclude that the plaintiff has not established a triable issue of fact on its second principal contention.

3. (a) In view of our conclusions on the two main points pressed by the plaintiff, we find no basis in either the doctrine of impossibility of performance or the doctrine of frustration of purpose to relieve the plaintiff of the obligations and risks it assumed. In substance, we agree with the arguments of the defendant's counsel that these doctrines do not apply to the circumstances of this case.

(b) We conclude that there is no issue for trial on the claim that the defendant violated an implied covenant of good faith and fair dealing or on the claim that the defendant violated G. L. c. 93A.

(c) We discern no basis for trial on the claim that the defendant committed a breach of its agreement by not immediately reserving $4,600,000 in funds. We construe the agreement as requiring no such specific reservation, and we view the defendant's marking of funds for the plaintiff's account as sufficient to meet its general obligation under the agreement.

Because the defendant was prepared to satisfy the obligations imposed on it by the unambiguous terms of the agreement, and because the plaintiff (which did not submit a single application under the agreement for a purchase money mortgage) has not shown the existence of a triable issue of fact, allowance of the defendant's motion under Mass.R.Civ.P. 56(b) was proper.

*Judgment affirmed.*

*Andrew R. Grainger* (*Fred A. Kelly, Jr.*, with him) for the plaintiff.
*James Coyne King* (*Barbara A. Wegener* with him) for the defendant.

---

as an employee of the defendant) had authority to bind the defendant. Moreover, his statement could not alter the provisions of an agreement that places the obligation to obtain private mortgage insurance on the plaintiff.

