Sherman, PJ.
Thisis an action in contractfor breach of a long-term lease of retail space in a shopping center owned by the plaintiff-lessor. The plaintiff seeks recovery of unpaid rent, taxes and common area maintenance fees owed by the tenant, corporate defendant Bradco Cleaners, Inc, in consequence of its abandonment of the leased premises upon the failure of its business. The plaintiffs claim against individual defendant David Bradley, Jr. derives from Bradley’s execution of a written guaranty of Bradco’s “full, prompt and faithful payment, performance and observance” of the parties’ commercial lease.
At issue on this appeal is whether the defendant’s contractual liability should be excused on the grounds of impossibility of performance or commercial frustration of purpose. The defendant contends that the benefit of its bargain in leasing commercial space in the plaintiffs shopping center was destroyed by the unexpected departure of the center’s “anchor” stores and the consequent reduction of consumer traffic and business opportunity in the center.
The reported evidence indicates that on March 31,1989, the parties executed afive-year lease for Bradco’s rental of 1500 square feet of retail space located in the Indian Head Shopping Center in Marlborough, Massachusetts. The lease provided for the defendant’s use of the premises for a retail, franchised dry cleaning business at a monthly rental of $1,733.33 plus a proportionate monthly share of the shopping center’s real estate taxes and maintenance fees.
The defendant admitted at trial that it had no previous experience in the cleaning business, and had failed to make any traffic or other studies of its potential business volume at the shopping center prior to executing the lease. It may be inferred from the defendant’s contentions on this appeal that it instead projected its potential business success solely on the fact that at the commencement of its five year lease term in April, 1989, the shopping center was tenanted by two, large “anchor” stores, Ames Department Store and Stop & Shop; by two other major retailers, Marshall’s and Walgreen’s, which occupied a combined 33% of the center; and by an undisclosed number of smaller “satellite” stores. The defendant-tenant presents as an economic maxim the argument that “ [s] atellite stores such as tenant’s are totally dependent upon the center being a point of destination” because of the location therein of anchor stores. However, the parties’ commercial lease in no way conditioned the defendant’s rental obligations upon the continued tenancy of Ames and Stop & Shop, or upon the general volume of business or occupancy level of the shopping center. There was no evidence that the defendant even inquired about the length or terms of the anchor tenants’ leases, much less communicated to the plain tiff thatitwas staking its business survival solely upon the consumer draw of the anchor stores, as it now contends.
*55 The parties’ lease did include a detailed statement of the parties’respective rights and liabilities upon the occurrence of a number of contingencies. Section 8.2 required the defendant to keep its cleaning business open during regular business hours, contained the defendant’s acknowledgment that its promise to do so was “a material inducement to the [plaintiff-] lessor to enter into this lease,” and set forth the plaintiffs remedies in the event of the defendant’s non-compliance. Section 15.3 memorialized the defendant’s continuing obligation to pay rent for the full lease term in the event of the defendant’s bankruptcy, insolvency or other default.
The defendant in fact defaulted on its rental payments in both May and June of 1990. In response to the plaintiff’s default notices, the defendant indicated by letter of June 6, 1990 that its first year sales of $100,000.00 had fallen well below its anticipated business revenues of $250,000.00. The defendant proposed a reduction of more than fifty (50%) percent in its annual base rent, which the plaintiff rejected.
On August 30,1990, the defendant notified the plaintiff that it would be closing its business on October 1,1990 because
[the] store isn’t doing the volume of business to sustain itself and business would have to increase so much that we feel it is best to close the store.... Marlboro is too much of a ‘blue-collar’ town and we underestimated the importance of street signage and the negative effect of being located down in the corner of the center.
Despite such notice and the fact that Ames Department Store subsequently closed its doors in November, 1990, the defendant continued to operate its business and to pay rent until its abandonment of the premises on January 31,1991. Stop & Shop closed sometime after the defendant’s departure. Marshall’s and Walgreen’s continue to do business in the plaintiff’s shopping center.[3]
The trial court entered extensive findings of fact which included the following:
The defendant contends that. . when the so-called anchor tenants . . . terminated their tenancies and left the shopping center, their departure somehow created such an unfavorable business climate that the defendant is relieved and excused from any further obligation to perform its obligations under the terms of the lease....
The lease required the Landlord ‘to use reasonable efforts to mitigate damages by attempting to find another tenant’..., and Landlord’s efforts though reasonable in that regard have proven to be unsuccessful.
The defendant further contends .. .[that] ‘the absence of such anchor stores has frustrated the very purpose of the lease... and since landlord is no longer providing a shopping center in any meaningful sense of the term, tenant’s continuing obligations to pay rent must be excused.’
The evidence presented to the court does not buttress or fortify the defendant’s claims. In fact there is no evidence that the defendant complained to plaintiff prior to terminating its lease.
There is evidence to show that a lack of business experience in the defendant and a general downturn in the economy were the cause of the *56 defendant’s problems.
There is not sufficient evidence to show that defendant’s liability for payment of rentis conditioned on a fully rented and tenanted shopping center.
Judgment was entered for the plaintiff for rent and other ancillary charges through May, 1992 in the amount of $32,957.33.
The defendant now claims to be aggrieved by the court’s denial of five of its requests for rulings[4] and its motion to amend the court’s findings.
1. There was no error in the court’s denial of defendant’s requests 3,6,7 and 8 which improperly presented questions of fact or mixed questions of fact and law upon which the court was not obligated to act. Crowingshield Shipbuilding Co. v. Jackman, 283 Mass. 21, 22 (1933); Liberatore v. Framingham, 315 Mass. 538, 543-544 (1944).The erroneous assumptions of fact and law interwoven in these requests were neither required by the reported evidence, relevant to the actual, material facts of the parties’ transaction, nor grounded in applicable contract and commercial law.
2. The concept of commercial frustration of purpose in this Commonwealth is considered a “companion rule” to the doctrine of impossibility of performance, and “nearly identical to the defense of ‘commercial impracticability’ found in the Uniform Commercial Code, G.L.c. 106, § 2-615.” Chase Precast Corp. v. John J. Paonessa Co., 409 Mass. 371, 374-375 (1991). The essence of all three commercial defenses is that:
[w]here, after a contract is made, a party’s principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate to the contrary.
Id. at375, quotingfrom RESTATEMENT (SECOND) OF CONTRACTS, §265 (1981). *57 It is undisputed that a “basic assumption” of the parties’ lease was the continued existence and operation of the plaintiffs Indian Head Shopping Center, in which the defendant’s rental space was located. Contrary to the defendant’s contention, it is equally clear that Indian Head continues to exist and operate as a shopping center, as is evidenced by the continuing tenancies of Marshall’s and Walgreen’s which have remained open for business in the Center at all times relevant to this action.
The fundamental flaw in the defendant’s invocation of the above commercial defenses on the grounds set forth in requests 3, 6, 7 and 8 is the absence of any correlation between the continuing existence of the Indian Head Shopping Center and the location therein of Ames and Stop & Shop as anchor stores. No evidence was advanced by the defendant to require a finding that the departure of the anchor stores resulted in the effective demise or failure of the Shopping Center. Stated alternatively, there is no evidence that a “basic assumption” of the parties’ actual lease was the continued presence of two anchor stores in the plaintiffs mall.
The defendant’s characterization, in its requests, of the parties’ contract as a lease of rental space in a shopping center occupied by two “major anchor stores” creating the business climate necessary for the financial survival of small business tenants is derived solely from the defendant’s subjective assumptions and expectations at the commencement of its lease term.[5] The most rudimentary tenets of contract law dictate, however, that one party’s unilateral assumptions and expectations do not constitute implied conditions or binding terms of a contract in the absence of the other party’s acceptance or assent. The rule of commercial frustration of purpose is itself applicable only where unexpected circumstances have “made performance of the promise vitally different from what should reasonably have been in the contemplation of both parties when they entered into the contract [emphasis supplied].” Mishara Construc. Co. v. Transit-Mixed Concrete Corp., 365 Mass. 122, 129 (1974), quotingfrom WILLISTON, CONTRACTS (Rev. ed.) §1931 (1938).
As the parties’ lease recites that it is a fully integrated agreement, its interpretation was subject to the “usual rule that the rights and liabilities of the parties are governed by the terms of their writing, the construction of which is... a matter for the court.” Charing Cross Corp. v. Comfed Mortg. Co., 25 Mass. App. Ct. 924, 925 (1987). As used in the parties’ lease, the term “Shopping Center” designates the aggregate of retail units and common areas physically constituting the plaintiffs “Indian Head Shopping Center” development. The lease is devoid of any suggestion that the “Shopping Center” was mutually defined or understood by both parties in terms of occupancy levels, business climate or revenues, or types of retail tenants. The defendant’s inability to prove that “from the nature of the contract it appears that the parties must from the beginning have contemplated the continued existence of [anchor tenants] as the foundation of what was to be done,” Boston Plate & Window Glass Co. v. John Bowen Co., 335 Mass. 697, 700 (1957), precluded the defense of frustration of purpose herein.
3. There is also no evidence herein of the remaining elements which define this commercial defense.[6] Just as the “basic assumption” of the parties’ lease was not affected by the termination of the anchor stores’ tenancies, the “principal purpose” of the defendant’s lease execution (to secure shopping center space for a dry cleaning *58 business) was not frustrated or impaired by the events in question. Any “impracticability” in the defendant’s continued contractual performance was causally related solely to the failure of its own business which predated any changed circumstances in the shopping center.[7]
Moreover, the departure of other tenants or a downturn in the commercial value and profit potential of retail space in a shopping center are risks inherent in any business venture like the defendant’s. Such contingencies did not constitute “unanticipated events,” the possibility of which was so remote that they could not have been foreseen by the parties’ at the time of lease execution. See generally, Mishara Construc. Co. v. Transit-Mixed Concrete Corp., supra at 128-129. The omission from the lease of any specific reference to such contingencies signified not that they were unforeseeable, but simply that they were legally irrelevant to the object and purpose of the form of the lease agreed to and executed by both parties. “Casualties not provided for in such a contract must be presumed to have been omitted intelligently and intentionally,” Gaston v. Gordon, 208 Mass. 265, 269 (1911), because of the parties’ general allocation of risks in the contract.[8]
The unequivocal terms of the parties’ lease render it clear that any risk of an economic downturn in the shopping center was imposed exclusively on the defendant-tenant. The defendant’s obligations to operate its business and to pay rent were unconditional, even in the event of bankruptcy, insolvency or any other financial default. The gravamen of the defendant’s complaints is that its business failure and resulting inability to pay rent were caused by declining business opportunity in the center. Even if the evidence supported such proposition, the defendant’s contention amounts to no more than a statement of reasons for its default. The defendant-tenant assumed the risk of financial default irrespective of cause, and it’s unconditional obligations cannot be excused because of the occurrence of the very contingency anticipated by the parties in their allocation of such risk. Where a risk is anticipated and assigned, the defense of impossibility of performance will not lie. See, e.g., Republic Floors of New England, Inc. v. Weston Racquet Club, Inc., 25 Mass. App. Ct. 479, 485. (1988). Nor can “a contracting party... be excused under the doctrine of frustration [of purpose] where the only ‘frustration’ consists in the fact that known risks assumed by him have turned out to his disadvantage.” Essex-Lincoln Garage, Inc. v. Boston, 342 Mass. 719, 721 (1961).
There being no error, the report is dismissed.

 The trial court denied the defendant’s motion to amend the court’s findings by adding a reference to the alleged departure from the shopping center of “all” of an undisclosed number of satellite stores over a period of several months subsequent to the defendant’s abandonment of the premises.

 “3. Where the parties, or either of them, in executing the lease agreement were proceeding on the assumption that the shopping center would continue to exist, and 30% occupancy is all that remains, with both major anchor tenants having departed, it can fairly be said that the basis of the bargain no longer exists, and it would be commercially senseless and unfair to oblige tenant under such circumstances to continue to pay rent to the landlord.
“4. In the absence of any provision in the lease document which addresses or allocates the risk that the shopping center might fail because of the departure of its two major anchor stores, that risk must be assumed by the landlord.
“6. Where a commercial tenanthas leased 1.2% of the space in a 132,000 sq. ft. shopping center which has become 70% vacant following the departure of its two major anchor stores (Stop & Shop and Ames), the absence of such anchor stores renders the tenant’s lease obligation unenforceable against the tenant because the underlying commercial purpose of the lease has been frustrated and rendered impracticable.
“7. Where a commercial tenanthas leased 1.2% of the space in a 132,000 sq. ft. shopping center which has become 70% vacant following departure of its two major anchor stores (Stop & Shop and Ames), the absence of such anchor stores has frustrated the very putpose of the lease arrangement, and since landlord is no longer providing a shopping center in any meaningful sense of the term, tenant’s continuing obligation to pay rent must be excused.
“8. Where a lease provision obligates the landlord in the event of default on tenant’s part to ‘use reasonable efforts to mitigate damages by attempting to find another tenant’, and where the departure of the two major anchor tenants has made it impossible in all practicality to obtain a successor tenant, the landlord’s consequential inability to be able to mitigate as required excuses tenant's obligation to continue to pay rent under the lease.”

These included sheer supposition that Ames and Stop & Shop would continue their tenancies, untested confidence in the economic future of the anchors and the business volume they could generate, and a naive assumption that it could profitably operate a business in which its principals had no experience solely on the basis of mere proximity to the anchors’ consumer traffic. Thus the essence of the defendant’s erroneous argument is that it contracted not for retail space in plaintiffs shopping center, but for the rental of business opportunity in a successful shopping center.

 These include “the foreseeability of the supervening event, allocation of the risk of occurrence of the event and the degree of hardship to the promisor.” Chase Precast Corp. v. John J. Paonessa Co., supra at 375 n.4.

 The defendant’s $150,000.00 revenue shortfall during the first year of its operations occurred during a period when the shopping center enjoyed full occupancy and had two major anchor stores. The defendant notified the plaintiff of its business failure and intent to abandon months before even the first anchor store departed. The evidence amply warranted the trial court’s finding that the defendant’s business failure was attributable to its own lack of business experience and the general economic recession.

 Tire question [in determining frustration of purpose] is, given the commercial circumstances in which the parties dealt: Was the contingency which developed one which the parties could reasonably he thought to have foreseen as a real possibility which could affect performance? Was it one of thatvariety of risks which the parties were tacitly assigning to the promisor hv their failure to provide for it explicitly? If it was, performance will be required [emphasis supplied].” Chase Precast Corp. v. John J. Paonessa Co., supra at 376. The trial court herein properly denied defendant’s request number 4 which set forth a contrary and erroneous proposition.