van Gestel, J.
This matter is before the Court on a motion of the defendant Eastern Bank, N.A. (“Eastern”) for summary judgment, a motion of the defendant Rodman & Rodman, P.C. (“Rodman”) for summary judgment and a cross-motion of the plaintiff, Charter Financial, Inc. (“Charter”), for summary judgment. The undisputed facts upon which these motions are grounded follow.

BACKGROUND

In 1994, Eastern extended a line of credit to Foremost Printing & Office Services, Inc. (“Foremost”). By 1997, Foremost was able to draw up to $4.2 million, in addition to a $200,000 permitted overadvance, under the line of credit. Thomas Barry (“Barry”) was the loan officer at Eastern who administered the Foremost line of credit.
In 1997, Foremost began exploring refinancing certain equipment used in its printing operations. On May 12, 1997, Charter sent a proposal to Foremost to provide financing of $1.7 million. William Terrano *269 (“Terrano”) was the credit officer at Charter responsible for reviewing Foremost’s financial information. On May 22, 1997, Terrano recommended that Charter provide $1,715,268 in financing to Foremost.
On May 27, 1997, Charter's Vice-Chairman, Henry Frommer (“Frommer”), reviewed the credit file on Foremost and the credit approval request form that was completed by Terrano. Frommer signed off on the credit approval request on May 27, 1997. At this time Frommer was aware that Terrano had not yet obtained any credit references on Foremost. The next day, May 28, 1997, Frommer signed a commitment letter to Foremost and sent it by facsimile to Foremost. The commitment letter included the following provisions:
Documentation: Mutually acceptable documentation.
Charter Financial, Inc. standard documents are contemplated.
Conditions Precedent:
Proceeds of the lease will pay off the Heller lease and $500,000 of the proceeds of the lease will be paid to Lessee.
Miscellaneous Terms and Conditions
Obtain as security the Equipment Lease Agreement between Foremost Printing & Office Services, Inc. and WEB Corp. Second Lien on Accounts Receivable and Inventory.
Since we will be using a net lease, Lessee will be responsible for all costs of maintenance, operation, insurance and taxes. This Commitment is subject to mutually acceptable terms, conditions, documentation and no material adverse change in financial condition or business reputation of Lessee, or any guarantor hereunder between now and any money takedown.
Foremost’s treasurer signed the commitment letter and sent it back to Charter by facsimile again on May 28, 1997.
On May 29, 1997, Terrano called Barry at Eastern seeking credit information on Foremost, and the two men spoke for about five minutes. Terrano does not have a precise recollection of the conversation, but he described the information he sought from Eastern as follows:
Usually when I call — if I want something specific as far as loan payments, you know, most banks want you to send a faxed form. I like to talk to the banker, just to get a flavor for the customer. And that was my. goal with him, you know, was he happy with this customer, would he continue to loan them money, those type of questions.
I just remember he was very happy with the relationship, that he liked the management. He said they always, you know, always basically met all their obligations to the bank. The bank would continue to do business with them. It was very positive — you know, it actually confirmed the financial statements. You know and through the financial statements, you saw a pretty good company. And now you have the banker saying that they’re a good company. So it made it more of a no-brainer type of deal, you know.
[H]e said the relationship with them was fine. You know, they’re good people. They didn’t have any problems with them. They’ve met all their — you know, their loan payments and things like that.
Terrano did not ask any specific questions about Foremost’s line of credit or the loan documents between Eastern and Foremost. Terrano did recall asking Barry whether Eastern had “always been happy with their payment history. I mean that was obviously what I was concerned about, did they pay their bills.” Barry confirmed that Foremost paid its obligations on time. Terrano also:
asked him what he thought about the management, because that, obviously is important. He said they were all good people. You know, they’re very reliable. They do what they say they’re going to do. You know, the kind of things that it’s nice to hear when you’re loaning somebody money.
Charter’s credit reference form contains sections that read:
EXPERIENCE: Satisfactory.
ADDITIONAL COMMENTS: Foremost has always maintained accounts in more than satisfactory status. The company and it’s [sic] management are held in high regard by Eastern Bank.
Neither Barry nor anyone else at Eastern provided Charter with any written information on Foremost’s financial condition or performance of its obligations under the line of credit. When Terrano contacted Barry for a credit reference on May 29, 1997, Barry was in the process of preparing the Foremost line of credit for renewal.
Charter funded the $1.7 million in financing to Foremost on June 10, 1997. On June 24, 1997, Eastern discovered that Foremost had- inflated the value of its accounts receivable by approximately $1 million. Eastern immediately froze the line of credit. Further, Eastern demanded that Foremost provide additional security for what appeared to be an over-advance on the line of credit. On July 9, 1997, Foremost gave Eastern an assignment of its interest in the equipment lease it had with Web Corp., and Eastern then asked Web Corp. to make the lease payments to Eastern. There is a factual dispute as to whether Eastern, at the time of this assignment, was aware of the prior assignment of the same lease to Charter.
Foremost failed to make its first lease payment to Charter on the date scheduled, July 10, 1997. Charter then contacted Web Corp. to request that it make the payments it owed to Foremost directly to Charter under the assignment from Foremost. Web Corp. in *270 formed Eastern that there was a competing claim for the rights to payment under the lease. Neither Eastern nor Charter ever received any monthly lease payments from Web Corp. Eastern, however, had a perfected security interest in the equipment leased to Web Corp. under Eastern’s all-asset lien on Foremost, and Eastern ultimately sold that equipment through a secured party sale.
Charter asserts two claims against Eastern: negligent misrepresentation and violation of G.L.c. 93A.
The other defendant, Rodman, is an accounting firm that was retained by Foremost to serve as its independent auditor and to provide it with year-end audited financial statements for its business. In 1997 Rodman audited Foremost’s 1996 financials. Rodman claims, however, that it did not provide any services related to Foremost’s equipment financing in 1997 or in prior years.
For a variety of reasons, Rodman was delayed in . issuing Foremost’s 1996 audited financial statements. It was not until mid to late May that Rodman completed the Foremost audit and issued its 1996 audited financial statement. Copies of Rodman’s audit were given by it only to Foremost and its agents. No one at Rodman provided copies of the 1996 audited financials or any other information about Foremost to Charter.
In his deposition, Herb Rodman, the principal at Rodman most involved with Foremost, testified: that no one at Rodman was aware in 1997 that Foremost was seeking financing from any entity, including Charter; that Rodman never saw any documents concerning the transaction between Charter and Foremost; and that Rodman had never even heard of Charter until after its transaction with Foremost was completed and Foremost had been taken over by Eastern.
Charter’s single count against Rodman asserts that Rodman knew or should have known that the Foremost 1996 financial statements, which it audited, and upon which Charter relied, were inaccurate and presented a distorted picture of Foremost’s financial condition.

DISCUSSION

Summary judgment is only appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Mass.R.Civ.R Rule 56(c). Each of the three motions will be assessed by the standards set out in Rule 56.
The Eastern Motion — Negligent Misrepresentation
The analysis of Eastern’s motion must begin with a conflict of law issue. What law applies: that of Massachusetts or that of New York? Eastern and Foremost are Massachusetts entities, doing business in Massachusetts in connection with the financial relations between Eastern and Foremost. Charter is a New York-based financing company that, in connection with its loan to Foremost, in Massachusetts, sought some free advice or comfort from Foremost's bank in Massachusetts. Eastern did not initiate the contact with Charter, and Charter offered Eastern nothing in return.
The only connection with New York is a single five-minute telephone conversation in which the man from Charter was in New York and the man from Eastern was in Massachusetts. The subject of that conversation was the relationship of the Massachusetts bank to its Massachusetts customer. The purpose of the conversation, initiated by Charter, was to provide the New York entity with post-commitment comfort regarding its impending loan to the Massachusetts bank’s Massachusetts customer.
Eastern, like all Massachusetts-based parties, was a subject and beneficiary of the protection from fraud provided by G.L.c. 259, Sec. 4. This Court concludes, therefore, that the choice-influencing considerations set out in Bushkin Associates, Inc. v. Raytheon Co., 393 Mass. 622, 634-36 (1985), compel a conclusion that the law of Massachusetts should determine whether Charter can enforce its claims against Eastern. See also Goebel v. Schmid Bros Inc., 871 F.Sup. 68 (D.Mass. 1994); Emery Corp. v. Century Bancorp., Inc., 588 F.Sup. 15, 18 (D.Mass. 1984).
Next the Court turns to the Massachusetts law, G.L.c. 259, Sec. 4. It reads:
No action shall be brought to charge a person upon or by reason of a representation or assurance made concerning the character, conduct, credit, ability, trade or dealings of any other person, unless such representation or assurance is made in writing and signed by the party to be charged thereby, or by some person thereunto by him lawfully authorized.
A version of this statute has been the law of Massachusetts for more than 165 years. See St. 1834, c. 182, Sec. 5. See also Norton v. Huxley, 79 Mass. (13 Gray) 285 (1859). Thus, there being no writing whatsoever reflecting whatever representations or assurances Eastern may have made about Foremost, the negligent misrepresentation count in Charter’s complaint may not be brought against Eastern.
Additionally, there exists a further basis for the granting of summary judgment on the negligent misrepresentation count: the absence of evidence of reasonable reliance by Charter.
Charter, in order to prevail on a negligent misrepresentation claim, must establish that “it relied upon such representation as true and acted upon it to [its] damage.” Barrett Assoc., Inc. v. Aronson, 346 Mass. 150, 152 (1963). See also Nycal Corporation v. KPMG PeatMarwick LLP, 426 Mass. 491, 496 (1998). The *271 undisputed facts, however, make clear that Charter did not rely on any statements or representations by Eastern when it committed itself to provide financing to Foremost.
Charter approved the Foremost financing on May 27, 1997, and signed its commitment letter on May 28, 1997. Foremost returned a copy of the commitment letter to Charter, signed by Foremost’s treasurer, on that same day, May 28, 1997. The first, and perhaps only, communication of any kind between Charter and Eastern was the telephone call between Terrano and Barry on May 29, 1997.
Charter’s commitment letter with Foremost became a “binding pledge made by [Charter] the lender to make a loan ... at a stated rate within a given period of time for a given purpose subject to the compliance of [Foremost] the borrower with stated conditions.” Charring Cross Corp. v. Comfed Mortgage Co., Inc., 25 Mass.App.Ct. 924, 926 (1987). Such a-commitment is a “solid commercial engagement” that is subject to contingencies, “the occurrence of which might abort the transaction.” Springfield Y Trust v. Executive Dir. of the Mass. Hous. Fin. Agency, 369 Mass. 709, 714 (1976).
Nothing in the “Conditions Precedent” or the “Miscellaneous Terms and Conditions” sections of Charter’s commitment letter to Foremost mentions anything about first receiving favorable bank references. The conditions relate solely to security being the Equipment Lease between Foremost and Web Corp. and a second lien on accounts receivable.
The fact that the commitment is said to have been subject “to mutually acceptable terms, conditions, [and] documentation” cannot be read to include Eastern’s comments in the post-letter telephone conversation. Nor can the requirement that there be “no adverse change in the financial condition or business reputation of [Foremost]” be expanded to capture Barry’s responses to Terrano’s inquiries of May 29, 1997. Much more emphatic words in a commitment letter are necessary to create a condition precedent of the kind suggested by Charter to enable it to avoid its contractual obligations to Foremost. See, e.g., Commerce Ins. Co. v. Koch, 25 Mass.App.Ct. 383, 385 (1988); Restatement (Second) of Contracts, Sec. 226, comment a (1981).
Having entered into a binding obligation with Foremost on May 28, 1997, Charter cannot now effectively contend that it relied upon statements from Eastern not made until the following day. See Page v. Frazier, 388 Mass. 55, 67 (1983).
The Eastern Motion — G.L.c. 93A
What remains of Charter’s Chapter 93A claim— there being no underlying claim for negligent misrepresentation — is based upon activities surrounding the two assignments by Foremost of the Web Corp. lease; the first to Charter, and the second to Eastern. There is a material factual dispute as to when Eastern first knew about the Foremost assignment to Charter. That dispute aside, however, the absence of any damages to Charter causes its c. 93A claim to fail.
The facts are undisputed that Web Corp. refused to pay either Charter or Eastern under the lease with Foremost once it learned of the two assignments. The fact that Eastern received no money from Web Corp. under its lease with Foremost left Charter in a position of suffering no damages resulting from the assignment to Eastern, even assuming Eastern had knowledge of the prior assignment to Charter. See Jet Line Services, Inc. v. American Employers Ins. Co., 404 Mass. 706, 718 (1989); Halper v. Demeter, 34 Mass.App.Ct. 299, 335 (1993).

The Rodman Motion

The Supreme Judicial Court’s decision in Nycal, supra, 426 Mass. 491, plays a major role in determining Rodman’s motion. In Nycal, the SJC adopted Sec. 552 of the Restatement (Second) of Torts (1977) as the liability standard that should apply to the scope of liability of an accountant to a person with whom the accountant is not in privity. In interpreting the standard, Justice Greaney said, at p. 498:
The better reasoned decisions interpret Sec. 552 as limiting the potential liability of an accountant to noncontractual third parties who can demonstrate “actual knowledge on the part of the accountant of the limited — though unnamed — group of potential [third parties] that will rely upon the [report], as well as actual knowledge of the particular financial transaction that such information is designed to influence” . . . The accountant’s knowledge is to be measured “at the moment the audit [report] is published, not by the foreseeable path of harm ‘ envisioned by [litigants] years following an unfortunate business decision.”
Later in Nycal, at p. 500, Justice Greaney explained the reasoning behind the ruling:
The rule we adopt today will preclude accountants from having to ensure the commercial decisions of nonclients where, as here, the accountants did not know that their work product would be relied on by the plaintiff in making its investment decision.
The only evidence — whether by deposition, answer to an interrogatory, admission, affidavit or otherwise— on the subject of Rodman’s “actual knowledge” of the “potential parties” that would rely on its 1996 audit or of the “particular financial transaction” that the audit was claimed to influence comes from Herb Rodman; and his testimony is essentially a complete denial.
Charter argues that Rodman is not credible and may be disbelieved by a jury. This, however, gains Charter nothing on the present motion. First, this Court should not take Rodman’s credibility into account in acting on a motion for summary judgment. Ruggiero v. Costa, 28 Mass.App.Ct. 967 (1990); Kaitz *272 v. Foreign Motors, Inc., 25 Mass.App.Ct. 198, 201 (1987); Sheehy v. Lipton Indus., Inc., 24 Mass.App.Ct. 188, 194 (1987).
Second, and more significantly, Charter cannot rest upon the mere allegations or denials of its pleadings. Its response to Rodman’s motion must, by affidavit or otherwise, set forth specific facts showing that there is a genuine issue for trial. Mass.R.Civ.P. Rule 56(e). The opposite of a negative answer cannot be presumed because the witness may not be credible or may have a propensity to state the expedient. Here, Charter offers nothing to counter Rodman’s denials but speculation grounded in the assumption that Rodman, because it was Foremost’s accountants, must have known that Foremost was looking for financing and must have known of the Charter transaction at the time the 1996 audit was released. This speculation, standing alone as it does, is not enough to defeat Rodman’s motion and therefore it is ALLOWED.

ORDERS

For the foregoing reasons, the motions for summary judgment of Eastern Bank, N.A. and Rodman & Rod-man, P.C. are ALLOWED; and the cross-motion of Charter Financial, Inc. is DENIED. Final judgment dismissing this case shall enter accordingly.