Garsh, J.
The plaintiff, Alfred S. Rezendes (“Rezendes”), doing business as First Atlantic Credit Corporation (“First Atlantic”), brings this action to recover a commission for obtaining, on behalf of the defendants Alice and Chester Barrows (collectively referred to herein as “the Barrows”), and Carpet Products , Inc. (“CPI”), a commitment letter for the financing of a loan that never closed. The plaintiff seeks recovery under the theories of breach of contract, fraud, negligence, and violation of G.L.c. 93A.[2] For the reasons set forth below, the plaintiff is not entitled to relief.
FINDINGS OF FACT
Based on all the credible evidence and reasonable inferences drawn from that evidence, the court finds the following facts:
Rezendes is a resident of Massachusetts who operates his business, First Atlantic, in Taunton, Massachusetts. First Atlantic is engaged in the origination, underwriting, and placement of commercial real estate loans and commercial financing. Rezendes is a licensed real estate broker. The individual defendants are Rhode Island residents. CPI is a Rhode Island corporation with a usual place of business in Cranston, Rhode Island; at all relevant times, it was a wholesaler- for floor covering, selling its products to floor cover installers, carpet stores, contractors, and decorators. CPI was owned by the Barrows. CPI leased several retail locations from the Barrows.
By 1995, CPI was struggling financially, and its suppliers were losing patience with the company’s payables record. The Barrows concluded that, in order for the business to remain viable, it needed a significant infusion of working capital. Accordingly, in April of 1995, on behalf of the Barrows, Edward Rau, Jr. (“Rau”), CPI’s vice president, chief financial officer, and general manager, met Rezendes in Taunton to discuss CPI’s need for financing. Earlier that year they had spoken by telephone concerning CPI’s financing requirements. At no point was Rezendes told that the Barrows personally needed financing. The sole purpose of the loan being sought was to enable CPI to liquidate an existing loan and to make badly needed working capital available to CPI.
First Atlantic drafted an Assent Agreement. Prior to doing so, Rezendes had given Rau a choice between the fee arrangement set forth in the Assent Agreement and one in which First Atlantic would be paid an hourly rate with the brokerage fee not tied to the closing. Rau rejected the hourly rate option. When Rezendes drafted the Assent Agreement setting forth the proposed terms for payment of his commission, he knew that the Barrows were seeking his services in order to arrange a comprehensive refinancing package for CPI, the purposes of which were to reduce the severely delinquent accounts payables, refinance existing debt with ITT Small Business Finance, build inventory, make funds available for opening new branch locations, and provide working capital to CPI. Rezendes was aware that, without new financing, it was questionable whether CPI would survive.
On April 24, 1995, Chester Barrows and Alice Barrows signed the Assent Agreement; the signing was witnessed by Rau. The Barrows agreed in that document to the following:
From the proceeds of the loan made by Slades [sic] Ferry Bank, I hereby assent to payment of 3% of the total financing commitment to be made directly to First Atlantic Credit Corporation or its assigns. Payment will be made in full at closing out of the loan proceeds.
Rezendes did not alert the defendants to the possibility that liability may be imposed upon them even if the loan did not close. The Assent Agreement was never *700 modified. Along with the executed Assent Agreement, on April 24, 1995, CPI forwarded the following documents to Rezendes in Taunton: CPI’s most recent operating budget, a loan proposal, personal financial statements for the Barrows, a commercial loan application, four years of financial statements for CPI, and three years of tax returns for CPI and for the Barrows. The loan proposal that was forwarded made clear what Rau had already informed Rezendes, namely that the purpose of the funds being sought was to help CPI. The loan proposal suggests that this be accomplished by way of a mortgage on properties owned by the Barrows in the amount of $850,000, the proceeds of which would be used to pay off an existing loan and to invest the net proceeds into CPI, which would enable CPI to take advantage of vendor discounts, improving its stock position. Rezendes was informed that CPI was at that time losing $20,000 to $30,000 a month in sales because of lack of available inventory. In the loan proposal, Rezendes was also told that CPI had only recently returned to profitability and that its profits were minimal and were restricted by the company’s under-capitalized position.
The Assent Agreement is the only agreement between any of the defendants and First Atlantic orRezendes. When First Atlantic undertook to locate financing after it obtained the signed Assent Agreement, it knew that the borrowers were seeking funds as soon as possible. The Barrows, CPI, and Rezendes did not contemplate or intend that it would take more than a year from the date the Assent Agreement was executed to close on a loan.
In addition to CPI’s inventory and accounts receivable, several properties owned by the Barrows were offered as collateral in the loan proposal forwarded to Rezendes. One of the pieces of real estate was a commercial building on Glen Road in Cranston, Rhode Island. When the Assent Agreement was executed, the defendants were unaware that there was any environmental problem with this property. They did not represent to Rezendes that each piece of proposed collateral was free of contamination and in compliance with applicable environmental statutes, rules and regulations. Nothing in the Assent Agreement obligated the Barrows to undertake remediation costs for unknown environmental problems.
When First Atlantic was engaged, the Barrows did not intend to sell the assets of CPI. The Barrows wanted to secure a mortgage loan in order to salvage CPI, and they had no other ulterior motive. The defendants did not seek financing in order to mislead any creditor of CPI.
After the Barrows and CPI had given First Atlantic the loan proposal and financial information, First Atlantic immediately began the loan underwriting process, which included financial analysis, site inspections of property that could be taken as collateral, and meetings with real estate appraisers. Rau delivered some documents to Rezendes at his office in Taunton, and they once lunched together in Taunton in 1995. It was clear to Rezendes that the Barrows would have to provide the primary security for the financing and that, without the Barrows’ security and income, First Atlantic would not be able to secure funding for CPI. It was equally clear that the purpose of the loan was to assist CPI and that the Barrows were not seeking financing for any reason other than to assist CPI. Rau told Rezendes that CPI was anxious to close on a loan as soon as possible. Rezendes prepared a financing proposal to submit to the target bank. The proposal included three parcels that Rezendes had selected to offer as collateral.
First Atlantic’s efforts bore fruit. On September 21 1995, the plaintiff obtained a $1,250,000 commitment from Slade’s Ferry Bank (“Slade’s”) of Somerset, Massachusetts. The loan, which was approved by a loan committee before the commitment letter was issued by the loan officer, was to be structured in two parts, a blanket mortgage loan of $850,000 on three parcels and a line of credit to CPI.[3] The bank was aware that the purpose of the entire loan was to provide funds to CPI. The mortgage was to be a twenty year amortization secured by real estate located at Glen Road and two other locations. The commitment letter expressly permits the Barrows to make a pass-through loan to CPI for the purpose of receiving payments to pay for the mortgage. The $850,000 mortgage to the Barrows is required to be guaranteed by CPI, and the $400,000 line of credit to CPI is required to be guaranteed by the Barrows.
The commitment letter states that the approval of the loan on the terms set out in that letter is subject to a variety of conditions. The conditions are independent and cumulative. One such condition requires the borrower to execute a loan agreement in form and substance satisfactory to the bank and its counsel. Another condition is that the loan close no later than November 30, 1995. The commitment letter further provides:
The foregoing terms and conditions are predicated upon our present understanding of the proposed financing and after a more comprehensive appreciation of the necessary mechanics and other details involved, some further assurance in the nature of security may be required. In addition to those terms and conditions which are stated above, Slade’s Ferry’s obligations hereunder are conditioned upon the Borrower’s execution of such representations, covenants and warranties as may be required by Slade’s Ferry. Such obligations are also conditioned upon no material adverse change taking place between the date of this letter and the closing concerning the Borrower’s financial condition.
Nothing in the commitment letter obligated the borrower to remediate environmental problems, if any, with the real estate securing the mortgage. Indeed, the *701 commitment letter does not expressly condition the bank’s willingness to loan on the collateral being in compliance with environmental laws. The commitment letter did, however, require the borrower to pay reasonable costs and expenses incurred by Slade’s incidental to the loan, including “appraisal [and] engineering (21E)” fees.
The Barrows and CPI were satisfied with the terms and conditions in the commitment letter. The parties to the commitment letter mutually intended that the various items denominated in the letter as conditions constitute conditions, the non-occurrence of which would discharge the bank’s obligation to loan. On or about October 12, 1995, Chester Barrows, Alice Barrows, and CPI each signed the letter as “borrower,” signaling their acceptance of the loan commitment on the terms and conditions set forth in the letter. Rau told Rezendes that the defendants wished to close as soon as possible, and, indeed, they did wish to close. For several weeks after the commitment letter was accepted, CPI repeatedly reiterated its desire to close as soon as possible.
The loan did not close by November 30, 1995. The failure to close is not attributable to any bad faith on the part of, or any wrongful act, omission, or interference by, the defendants. The loan did not close within a reasonable period of time after November 30, 1995. The failure to close within a reasonable time frame after November 30, 1995 is not attributable to any bad faith on the part of, or any wrongful act, omission, or interference by, the defendants.
By March of 1996, the defendants no longer were seeking Rezendes’ assistance in making the closing a reality. Until late March, Rau spoke with Rezendes approximately three times a month, usually about the status of Lincoln’s efforts to resolve the environmental problem. When they spoke, Rezendes was at his office in Massachusetts and Rau generally was in Rhode Island. The failure of the loan to close by March 1, 1996 or thereafter is not attributable to any bad faith on the part of, or any wrongful act, omission, or interference by, the defendants. By the end of March, if not earlier, the commitment letter had expired as had the Assent Agreement.
Prior to the closing date set out in the commitment letter as a condition, Cistar & Associates (“Cistar”), the bank’s environmental firm, identified a drainage system in the Glen Road property that did not conform to guidelines of Rhode Island’s Department of Environmental Management (“DEM”). The bank was unwilling to make the loan unless and until the environmental problem was remedied. Cistar proposed a remediation project with an estimated cost of twenty thousand dollars, which included excavating a portion of the floor and foundation of the Glen Road properly. CPI requested Rezendes to assist in solving the problem, but it balked at Cistar’s cost estimates. Rezendes either failed to suggest or the bank did not accept a substitution of collateral.[4] What Rezendes did accomplish was the bank’s authorization to discharge Cistar and to engage Lincoln Environmental (“Lincoln”), a firm that First Atlantic had successfully used in the past. Rezendes anticipated that Lincoln would be able to resolve the problem at a cost significantly less than the one Cistar had estimated. The defendants did not promise Rezendes or Slade’s that they would do whatever Lincoln determined to be necessary to resolve the problem.
Lincoln had a difficult time devising a remedy to the situation at Glen Road, due, in part, to the difficulty in identifying where the drain discharged on the older section of the site. Lincoln requested from Chester Barrows, but did not receive, as-built plans. The failure to receive the plans for the older section of the site delayed resolution of the problem by two to three months. Chester Barrows did not have the plans for the older section to provide. He thought that he was familiar with the drainage system and provided Lincoln with information about the placement of drains on the site. With respect to the newer section of the site, which he had himself designed, the information he provided was accurate; it was inaccurate with respect to the older section of the site which he had not designed. Chester Barrows did not know that the information was inaccurate when he provided it to Lincoln; he was not attempting to hinder the loan closing. Lincoln quickly ascertained that the information was incorrect. The inaccurate information concerning placement of the drains did not materially delay resolution of the environmental problems. I infer that had the as-built drawings been provided and no inaccurate information been conveyed by Chester Barrows, and had the Barrows been willing to spend what was required to secure DEM approval, Lincoln would not have obtained final written DEM approval by the end of March 1996 or before CPI experienced a material adverse change.
Shortly after the commitment letter was accepted by the defendants and prior to the closing date set out as a condition in that letter, the bank proposed a draft loan agreement which was not tailored to the terms of the transaction that had been approved by both the bank and the defendants. Protracted negotiations followed continuing through December in an attempt to get the bank to tailor the loan documents to the terms of the commitment letter. The problems that the Barrows had with the loan agreement were legitimate ones that were not raised in an effort to scuttle the closing. Rezendes spent time in the first several weeks after the documents were provided negotiating numerous changes in the loan documentation package that had been prepared by Slade’s counsel. Rezendes, Rau, and a loan officer from Slade’s met in late 1995 in Somerset, Massachusetts to discuss the loan documents. When Rezendes put in the time helping to negotiate the *702 terms of a loan agreement, the defendants were still anxious to close as soon as possible. As a result of First Atlantic’s efforts, numerous deletions and modifications to the loan agreement were made that were favorable to the Barrows. However, the final draft that was circulated by the bank still had provisons that the Barrows reasonably believed to be unacceptable, namely, giving Slade’s the right to call the mortgage loan if the bank deemed itself insecure. The commitment letter had stated only that the mortgage loan would be “written with a 20 year amortization.” The Barrows did not intend to sign the loan agreement as so drafted. I infer that Slade’s was not prepared to delete the language which troubled the Barrows. The Barrows and the bank did not reach agreement on the substance of a loan agreement that was reasonably satisfactory to both. The condition in the commitment letter that the borrower execute a loan agreement “in form and substance reasonably satisfactory” to the bank did not occur; its failure to occur was not the fault of the defendants.
By late March, it became clear to Rau that CPI’s financial condition had deteriorated to point that it would be forced into bankruptcy were its assets not sold soon. There had been many snowstorms in the winter of 1995-96 and, as a result, sales had plummeted. CPI needed daily sales of approximately $31,000 to break even; in the months following November 30, 1995, daily sales trailed to $20,000 and then had dropped to $6,000 to $7,000 a day. By late March or early April, Rau informed the Barrows that CPI had been materially and adversely affected over the winter months and that, even if the loan could close, the proceeds would be insufficient to enable CPI to survive. CPI had, indeed, undergone a material adverse change to its financial condition.[5] During the winter months, CPI suffered such significant monthly operating losses that the line of credit to be made available should the loan close would not resolve the company’s long term under-capitalization problem. CPI’s operating losses had increased by approximately $250,000 to $300,000 between the date of the commitment letter and the end of March. Rau advised the Barrows that selling the assets of CPI, putting CPI into voluntary bankruptcy, or waiting for creditors to put CPI into involuntary bankruptcy were their only options.
The Barrows reasonably believed that CPI had undergone a material adverse change and that they had as well.[6] By late March or early April, the defendants reasonably believed that Slade’s was not required to lend them any funds. No action of Slade’s could have been reasonably interpreted by them as evidence that, in the spring of 1996, the Barrows had an enforceable financing commitment upon which they were free to rely. Had the bank been made aware of the material adverse changes, it would not have closed on the loan.[7]
The commitment letter was not modified. Slade’s, the plaintiff, and the defendants did not orally or in writing propose or assent to a modification of any of the conditions contained in the commitment letter. The plaintiff was not authorized to modify the terms of the commitment letter. The parties to the commitment letter never reached a mutual agreement, orally, in writing, or impliedly through their conduct, as to an acceptable time within which the loan was required to close after the November deadline passed. I infer that the defendants would not have assented to a commitment letter that conditioned the loan on the closing occurring no later than April, May or June of 1996 or that did not require that there be no adverse changes because such conditions operated to protect both the lender and the borrower.
The conditions in the commitment letter were not waived by Slade’s or otherwise excused. The loan officer from Slade’s did not tell Rezendes or any of the defendants that the bank had waived any of the conditions in the commitment letter. No intent to waive was communicated to the defendants. The course of dealings, after November 30, 1995, between Slade’s and the plaintiff and between Slade’s and the defendants does not demonstrate that the bank had waived any of the conditions in the commitment letter. Although the terms of the commitment letter might have continued to be economically beneficial to the bank, and, thus, it may have been prepared in the spring of 1996 to close if all the original conditions other than the closing date had been satisfied, Slade’s did not intentionally relinquish its known right, to refuse to close for any reason once the November deadline passed. Slade’s did not intentionally relinquish its right to refuse to close should there be a material adverse change. Slade’s did not intentionally and with purpose relinquish any known right contained in the commitment letter.
The Barrows authorized Rau to seek a purchaser for CPI when he informed them of the material adverse change rendering it impossible honestly to represent to Slade’s that no material adverse change had taken place after the date of the commitment letter. Rau immediately began initiating contacts with potential purchasers. When the Barrows decided to attempt to sell CPI, they did not bother to advise Rezendes, but neither were they pressing any longer for a closing. The defendants did not encourage the plaintiff to do any work to bring about a closing once they realized that there had been a material adverse change. The nondisclosure was not prompted by an intent to stall creditors. The nondisclosure was not intended to induce the plaintiff to act or not to act. The defendants did not represent that they wished to close on the loan when in fact they did not. Rezendes did not take any action to his detriment in reliance upon the defendants’ nondisclosure.
*703 In mid-May, upon discovering from Lincoln that it appeared that the environmental matter would soon be able to be remedied, Rezendes contacted Rau, who advised him that the Barrows had undergone a change of heart because of CPI’s financial state. The plaintiff has not demonstrated that he expended more than a de minimis amount of time, if any, in connection with the loan after the defendants decided to attempt to sell CPI, but before he discovered this fact. The plaintiff was not hurt by the nondisclosure.
In late May of 1996, Lincoln obtained verbal assurance from DEM that it would not find the Glen Road site in violation if certain fill work were to be completed and the contaminated materials stockpiled on the site properly removed. Lincoln did not do the work required by the DEM. Lincoln was informed by the plaintiff that CPI was having difficulty paying its bills and, as a result, Lincoln sought assurance from CPI that it would be paid for doing the work that still remained to be done. When CPI told Lincoln that it could not give that guarantee, Lincoln stopped its work at the site.
The assets and goodwill of CPI were sold on June 10, 1996 in a closing that did not take place in Massachusetts.
The plaintiff has incurred expenses of approximately one thousand dollars pursuing his claim against the defendants and has entered into a one-third contingency fee agreement with his counsel.
RULINGS OF LAW Count III — Breach of Contract
Rezendes claims that the Barrows breached a contract by failing to pay the commission due to First Atlantic pursuant to the Assent Agreement dated April 4, 1995. In the contract, which was drafted by the plaintiff, the Barrows assent to payment of a commission ”[f]rom the proceeds of the loan made by Slades [sic] Ferry Bank” and, further, commit that ”[p]ayment will be made in full at closing out of the loan proceeds.” There never were any proceeds because the bank loaned no funds to the defendants. The Barrows did not breach any express term in their written agreement. When Rezendes agreed to help the defendants find financing on the terms spelled out in the Assent Agreement, as opposed to accepting them as clients only if they agreed to pay for his services at an hourly rate, the plaintiff explicitly assumed the risk that, even if he successfully secured a commitment to loan from Slade’s, such a loan might not take place and that his time and efforts would not be compensated if no closing occurred. It would be unusual for a binding loan commitment to be automatically unconditional and enforceable. Therefore, a broker who enters into an Assent Agreement in which the putative borrower assents only to payment of a commission “from the proceeds of the loan" has not earned his commission simply by securing a commitment letter.
The plaintiff has also failed to demonstrate that application of the principles applicable to real estate commissions, articulated in cases such as Tristram's Landing, Inc. v. Wait, 367 Mass. 622, 629 (1975),[8] entitles him to a commission. Generally, a real estate broker earns his commission only when:
(a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner to do so, and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract.
Id. at 629, quoting Ellswroth Dobbs, Inc. v. Johnson, 50 N.J. 528, 551 (1967). However, “if the failure of completion of the contract results from the wrongful act or interference of the borrower, the broker’s claim is valid and must be paid.” Id.
In the fall of 1995, Rezendes did provide the Barrows with a lender ready, willing and able to lend to the defendants on terms the borrowers found acceptable. Furthermore, when the defendants accepted the commitment letter, Slade’s and the defendants entered into a binding contract. A loan commitment in the banking business is a “binding pledge made by the lender to the borrower to make a loan usually at a stated rate within a given period of time for a given purpose subject to the compliance of the borrower with stated conditions." Charing Cross Corp. v. Comfed Mortgage Co., Inc. 25 Mass.App.Ct. 924, 926 (1987) (rescript), quoting American Bankers’ Association, Banking Terminology 58 (1982). See also Springfield Y Trust v. Executive Director of the Massachusetts Housing Finance Agency, 369 Mass. 709, 714 (1976) (a loan commitment is “a solid commercial engagement on both sides” that is subject to “contingencies the occurrence of which might abort the transaction”). Conditions in a commitment letter do not prevent a binding contract from springing into being, but they may subsequently defeat it by relieving the lender of the obligation to consummate the loan. Massachusetts Municipal Wholesale Electric Co. v. Danvers, 411 Mass. 39, 45 (1991).
Slade’s performance was conditional upon the occurrence or nonoccurrence of a number of matters. Through no fault of the defendants, there was no closing by November 30, 1995. Once that date passed, there was no binding commitment to loan. The binding pledge that Slade’s made was, as is typical in commitment letters, one to make a loan “within a given period of time.” Charing Cross Corp., 25 Mass.App.Ct. at 926. Thus, Rezendes cannot take advantage of the wrongful act or interference exception to the general rule that no commission is earned unless there is a closing. Capezzuto v. John Hancock Mutual Life Insurance Co., 394 Mass. 399, 403 (1985).
The condition in the commitment letter that the closing occur by November 30, 1995 was not modified to obligate the bank to loan if the closing did not take
*704 place until the spring of 1996. That condition was not waived. Modification is a mutual agreement to change the terms of an existing contract which may be express or inferred from the conduct of the parties. Cambridgeport Savings Bank v. Boersner, 413 Mass. 432, 439 (1992). The plaintiff did not prove that Slade’s and the defendants mutually agreed to modify the commitment letter to provide that the closing would occur no later than March, April, May or June of 1996. The plaintiff has the burden of proving waiver by a preponderance of the evidence. Waiver, even of a right contained in a contract, may be oral or it may be implied. “Waiver is the intentional relinquishment of a known right." Niagara Fire Insurance Co. v. Lowell Trucking Corp., 316 Mass. 652, 657 (1944). “Unless the evidence is clear, unequivocal, and undisputed, waiver is ordinarily a question of fact and not of law.” Metropolitan Transit Authority v. Railway Express Agency, 323 Mass. 707, 709 (1949). This court has found that Slade’s did not intentionally and with purpose relinquish any known right contained in the commitment letter and that the nonoccurence of any of the conditions was not otherwise excused.
“A condition precedent defines an event which must occur before ... an obligation to perform arises under the contract... If the condition is not fulfilled . . . the obligations attached to the condition, may not be enforced.” Massachusetts Municipal Wholesale Electric Co., 411 Mass. at 45 (citations omitted). See also Wood v. Roy Lapidus, Inc., 10 Mass.App.Ct. 761, 763 n.5 (1980) (“A condition precedes an act which must occur before performance by the other party is due”); Restatement (Second) of Contracts, §§224,225. The mere fact that negotations between the parties to the commitment letter continued for some period of time after November 30, 1995 and that they may have acted as if the loan ultimately would close does not mean that Slade’s was still bound in the spring of 1996. American Oil Co. v. Katsikas, 1 Mass.App.Ct. 437, 439 (1973).
In the absence of waiver or modification, the contract provision terminating the agreement upon passage of the closing date without tender of performance must be given effect. At the expiration of the closing date, without tender by either party, the contract was at an end, and both parties were discharged.
Id. at 440.
It was the plaintiff who negotiated the commitment letter which released the bank from any legal obligation to make a loan after November 30 1995. Even if the environmental matter had been resolved by April 1, 1996, and even if the defendants had been willing to execute the loan agreement in the form required by the lender, and even if there had been no material adverse changes, Slade’s was not legally bound to make the loan in the spring of 1996. At the end of March, the condition that the loan close by November 30, 1995 could no longer occur. Because the bank was not bound at that time to make the loan, the defendants were free to attempt to sell and to sell their business to a third parly.
Wholly independent of the condition that the loan close no later than November 30, 1995, by April 1, 1996, the language in the commitment letter expressly conditioning performance upon no material adverse change taking place in the borrower’s financial condition between the date of the letter and the closing also left the defendants free to sell CPI. A duty may be conditioned upon the failure of something to happen rather than upon some event occurring. Restatement (Second) of Contracts, §224, comment b. The no material adverse change condition in the commitment letter was not modified, and it was not waived by Slade’s. By the spring of 1996, that condition no longer could occur. The bank would not have closed had it known about the material adverse change[9] and, once that change occurred, Slade’s was discharged of any legal obligation it may otherwise still have had to make the loan without regard to whether the bank knew or did not know of the material adverse change. Id. at §225, comment e.
The Barrows also were unable to close on the loan in accordance with the provisions of the commitment letter because Slade’s had not provided them with a loan agreement to execute that was both satisfactory to Slade’s and that represented the terms of the loan as agreed upon in the commitment letter. It was a condition of the commitment that the Barrows execute a loan agreement in form and substance satisfactory to the bank. That condition was not modified or waived. Slade’s was not ready, willing, and able to provide the Barrows with a loan agreement to execute in a form that would have permitted a closing. While that condition theoretically still could have occurred, Slade’s binding obligation to loan nevertheless had been discharged because, inter alia, the condition had not been met within a reasonable time. Id. at §224, comment a (the time within which the condition can occur in order for the performance of the duty to become due is, in the absence of a time expressed in the agreement, a time that is reasonable in the circumstances).
Finally, Slade’s was not ready, willing or able to close as long as the environmental issue remained outstanding. Not until late May did it appear that Lincoln was close to securing clearance from the DEM. By that time, while the environmental problem remained capable of being remedied, Slade’s binding obligation to loan had been discharged because, inter alia, it had not been remedied within a reasonable time. Id. at §225, comment a, illustration 1 (if the pledge of collateral is a condition to a duty to sell and if the agreement does not provide for the time in which the collateral is to be pledged, the duly to sell is discharged if the collateral is not pledged within a reasonable time). Furthermore, even in late May, the *705 environmental problem could have been resolved only If the defendants had been willing to expend funds to do what the DEM was requiring. Nothing in the commitment letter created a duty obliging the defendants to expend those funds. Given CPI’s financial condition in May of 1996, the length of time that had passed since the commitment letter was executed and since the date set out in that letter as the date by which the closing had to occur, and all the other attendant circumstances, it was not unreasonable for the defendants to have refused to spend money on remediation.
No wrongful act or misconduct on the part of the Barrows prevented or interfered with the loan closing on the terms agreed upon in the commitment letter. A closing was not delayed or hindered by unethical acts by the defendants or bad faith on their part. The mere nonoccurrence of a condition set out in the commitment letter is not, in and of itself, wrongful. The “nonoccurrence of a condition is not a breach by a party unless he is under a duty that the condition occur." Id. at §225(3).
The fact that property owned by the Barrows had an illegal drainage system about which the Barrows were unaware does not amount to wrongful conduct. Both the decisions of the Supreme Judicial Court, “and those of the Appeals Court, have consistently insisted on wrongful conduct on the part of the [borrower] which undermines completion of the [loan] as a prerequisite to a broker’s recovery.” Hillis v. Lake, 421 Mass. 537, 542 (1995) (seller’s inability to back up its promise that land is free of toxic materials does not entitle broker to a commission). Chester Barrows never represented to the plaintiff (or to Slade’s) that the site was in full compliance with all DEM rules and regulations. He gave information to Lincoln concerning the drains that he, in good faith, believed to be true. Lincoln did not receive as-built plans for the old section, where Chester Barrows’ information proved to be incorrect, because Chester Barrows did not possess such plans. In mid-May, the Barrows were under no obligation to guarantee to Lincoln that it would be paid for the work that remained to secure DEM approval. The defendants, while anxious to resolve the drain problem, had never promised to spend whatever it would take to fill the drain and to remove hazardous materials from the site. Hillis, 421 Mass. at 542-43.
The Barrows had good reasons to refuse to execute the loan agreement as drafted by Slade’s and were not prompted to do so by a motive to hinder the bank’s performance of its obligations under the commitment letter.
Finally, the adverse changes in CPI’s financial condition flowed from the exceptionally snowy winter and very poor sales and not from any wrongihl act of the Barrows. They took no act designed to trigger a material adverse change. Cf. Higgins v. Ginsburg and Goodman, Inc., 278 Mass. 497, 501 (1932).
Under these circumstances, the solicitation of a buyer for CPI and ultimately the sale of the assets of CPI were not wrongful acts or interference entitling the plaintiff to a commission on the loan from Slade’s that did not close.
Count IV — Fraud
In order to recover on the fraud claim, the plaintiff must prove, by a preponderance of the evidence, that the defendants made a false representation of material fact with knowledge of its falsity for the purpose of inducing the other party to act thereon and that the other parly relied upon that representation as true and acted upon it to his damage. Barrett Associates, Inc. v. Aronson, 346 Mass. 150, 152 (1963). A statement of present intentions about future conduct maybe fraudulent if the speaker misrepresents his actual intentions. McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 709 (1990). Silence is not a basis for fraud unless there is a fiduciary duty or other obligation to disclose. See Urman v. South Boston Savings Bank, 424 Mass. 165, 168 (1997). There is no evidence, and Rezendes does not claim, that the defendants made any affirmative misrepresentation or fraudulent nondisclosure when he was engaged. Rather, the plaintiff maintains that, when the defendants decided to solicit potential purchasers for the assets of CMI, they were obligated to advise him of their new intentions and that their failure to do so constitutes fraud.
The Barrows did not decide to sell the assets of CPI until the end of March, at the earliest. By that stage, whatever disclosure obligation may have been created by the entering into of a brokerage relationship had terminated. The Assent Agreement, signed by the parties in April of 1995, did not include an expiration date. Where, as here, the agreement contemplates a definite result and the agreement itself lacks an expiration date, the law implies that it will continue for a reasonable time. Plymouth Port, Inc. v. Smith, 26 Mass.App.Ct. 572, 573, rev. denied, 403 Mass. 1106 (1988). Nothing in the Assent Agreement provides that it shall continue until the broker is notified to the contrary. If the broker intended to require such notice it was his burden to include it in the Assent Agreement. He did not, and, therefore, the agreement was in effect only for a reasonable period of time.[10] Id.
What is reasonable depends upon the intent of the parties, the nature of the contract, and other attendant circumstances. Id. See also Alexander v. Berman, 29 Mass.App.Ct. 458, 461 (1990). Here, the necessity for the loan to close as soon as possible so that CPI would not be forced into bankruptcy was made known to Rezendes when he was retained. Rezendes was fully aware of the situation and needs of the defendants.
Thus it was necessarily implied by the relation between the parties that the person to be produced by the plaintiff to make the loan on the property must be able, willing and ready to make the loan only at the time that the defendants] could use it *706 ... It was the plaintiffs duty to produce a person, ready, willing and able to make the loan at the time when both the plaintiff and the defendant(s) knew it was needed and could be of use.
Higgins, 278 Mass. at 499-500.
By the time of the alleged fraudulent non-disclosure, over a year had passed with no closing having taken place through no fault of the defendants. By the end of March, Slade’s was not obligated to close on a loan with the defendants. As a matter of law, a reasonable time for the brokerage contract to remain in force also had lapsed, and the defendants were free to decide that they no longer wanted a loan. Because the Assent Agreement was no longer in effect, there was no duty on the part of the defendants to inform Rezendes that they were soliciting buyers for CPI.
There is nothing to show any fiduciary relation between the parties, or that the plaintiff stood in a position of confidence toward or dependence upon the defendant. . . The charge is concealment and nothing more; and it is concealment in the simple sense of mere failure to reveal, with nothing to show any peculiar duly to speak. The characterization of the concealment as false and fraudulent of course adds nothing in the absence of further allegations of fact.
Greenery Rehabilitation Group, Inc. v. Antaramian, 36 Mass.App.Ct. 73, 77 n. 5 , rev. denied, 417 Mass. 1103 (1994), quoting Province Securities Corp. v. Maryland Casualty Co., 269 Mass. 75, 92 (1929).
The fact that Rezendes and the defendants continued to communicate about the environmental problem through the end of March even after the defendants had stopped pressing for a closing did not keep the Assent Agreement in force. The Assent Agreement was not amended orally or in writing, and “[i]t would ill serve the intent of the Legislature to recognize renewal of an expired written agreement by conversation alone.” Alexander, 29 Mass.App.Ct. at 462.
Even if the defendants were under an obligation to disclose their change of plans to Rezendes in late March or early April of 1996, the plaintiff has not demonstrated, by a preponderance of the evidence, that the nondisclosure was fraudulent. During the period of non-disclosure from late March, at the earliest, to mid-May, the defendants did not fail to disclose in order to induce Rezendes to act or not to act. The plaintiff has failed to establish the intent element of fraud. Furthermore, any nondisclosure by the defendants at the end of March of 1996 or thereafter did not induce Rezendes to take any action of a substantial and material nature. By that time, the plaintiff, an experienced loan broker, must have realized that Slade’s obligations under the commitment letter had been discharged as a matter of law. Reliance on any such nondisclosure would not have been reasonable. Cf. Saxon Theatre Corp. v. Sage, 347 Mass. 662, 666-67 (1964). Moreover, the plaintiff has not proved any actual reliance to his damage upon the nondisclosure.
Count VI — Negligence (Implied Covenant of Good Faith and Fair Dealing)
Count VI, denominated as one for negligence, seeks damages on the theory that the defendants breached the implied covenant of good faith and fair dealing contained in the Assent Agreement when they solicited buyers for, and sold the assets of, CPI. Implicit in every contract is a covenant of good faith and fair dealing. Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471 (1991) (implied covenant of good faith and fair dealing breached where party to contract withheld approval of redevelopment authority’s master plan in bad faith in order to force financial concessions from other party). As a result, neither party to a contract may do anything that destroys or injures the other party’s right to receive the fruits of the contract. Id. at 471.
In order for the defendants to have breached the covenant of good faith and fair dealing, it is necessary for there to have been a contract in existence between the parties. As discussed above, when the defendants decided to solicit buyers, the Assent Agreement had expired as had the commitment letter. Nothing precluded the Barrows from taking steps that otherwise might be viewed as interfering with the fundamental purpose of the Assent Agreement.
Moreover, it was not the defendants who destroyed the broker’s right to receive the fruits of the Assent Agreement. The defendants did not raise pretextual objections to the loan document drafted by Slade’s. Nor did they create the material adverse change or hinder resolution of the environmental problem. It was not the defendants’ fault that the loan did not close on November 30, 1995. Had the defendants not sold the assets of CPI, the loan would not have closed in June 1996 because of the material adverse changes, among other reasons.
Count VII — Chapter 93A
General Laws c. 93A, §2(a) makes unlawful any “deceptive acts or practices in the conduct of any trade or commerce.” Under Section 11 of the statute, “(a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property ... as a result of the use or employment by another person who engages in trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by Section two" may seek damages. The interactions between the plaintiff and the defendants concerned a commercial transaction, and the individuals were acting in a business context within the scope of Section 11. See Szalla v. Locke, 421 Mass. 448, 451 (1995); Begelfer v. Najarian, 381 Mass. 177, 190-91 (1980). The defendants’ conduct, however, was not unlawful.
*707 Conduct that a reasonable business would find reprehensible is unfair. Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. 390, 414 (1991), rev’d on other grounds, 412 Mass. 703 (1992). “(Cjonduct ‘in disregard of known contractual arrangements’ and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes.” Anthony's Pier Four, Inc., 411 Mass. at 474. A deceptive act or practice is one which hás the capacity to deceive. An act or practice is deceptive if it could reasonably cause a person to act differently from the way he would act if he knew the truth about the matter. Sargent v. Koulisas, 29 Mass.App.Ct. 956, 958 (1990) (rescript). Intent to deceive is not always necessary. Maillet v. ATF-Davidson Co., 407 Mass. 185, 193 (1990).
Considering the circumstances, the defendants made no affirmative misrepresentation or fraudulent non-disclosure or otherwise acted in an unfair or deceptive fashion whether they failed, in the spring of 1996, to disclose their intent to sell CPI or when they sold CPI. The defendants took no action in connection with the Assent Agreement (or the commitment letter) that fell within some established concept of unfairness. Their actions also were not immoral, unethical, oppressive, unscrupulous, or otherwise unconscionable. Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986). The failure to disclose was not an act which, in these circumstances, reasonably could have or did cause the plaintiff to act differently from the way he would have acted if the disclosure had been made. When the Barrows decided to sell CPI, they acted to stave off that corporation’s bankruptcy. Rezendes fully understood when he was engaged that it was necessary to secure funding for CPI as soon as possible because of CPI’s working capital needs. By early spring of 1996, it was clear to the defendants that there had been a material adverse change and that, for a variety of reasons, nothing in the commitment letter bound Slade’s to make the loan on the terms set forth in that document. The defendants did not act in disregard of known contractual obligations. The Barrows did not take advantage of the environmental problem to delay a closing and did not, in bad faith, refuse to sign the loan agreement prepared by Slade’s. Given all the attendant circumstances it was neither unfair nor deceptive to deem the Assent Agreement as having expired and to initiate negotiations with potential buyers and to sell the assets of CPI.
ORDER
For the above-stated reasons, it is hereby ORDERED that judgment enter in favor of defendants dismissing the complaint.

 Two additional counts seeking recovery on the theories of quantum meruit and unjust enrichment were dismissed by the court (Toomey, J.) [7 Mass. L. Rptr. 216]; the plaintiff dismissed a claim for interference with advantageous business relations at the outset of the trial, and, during the trial. the plaintiff dismissed, as against CPI, his claim for breach of contract.

 CPI is listed in the commitment letter as a borrower “assuming the loan is a corporate line of credit.” Elsewhere the commitment letter makes clear that the line of credit is intended to be a loan to CPI and not to the Barrows; it requires “]r]epayment of the line of credit to Carpet Products [to] be unconditionally guaranteed by Chester and Alice Barrows,” and the execution lines under “Borrower” include a line for “Carpet Products, Inc.” It also requires any debts owed by CPI to any individuals to be subordinated to Slade’s. CPI also is obligated to provide Slade’s with a certified copy of its Articles of Organization and By-laws, its Certificate of Legal Existence, and reviewed financial statements within 120 days of its fiscal year.

 Although there were first mortgages on the other pieces of property that the Barrows had suggested as collateral, the Barrows had indicated to Rezendes that it might be possible to negotiate a new collateral position; the value of the other properties exceeded the value of the outstanding loan by $369,000. The Glen Road property had an approximate value of $300,000.

 When Rau spoke with a potential purchaser of CPI in mid-May, he advised that he was not sure whether CPI could stay open through the negotiation process. The financials provided to that purchaser in April showed that CPI’s financial condition had deteriorated over the previous few months.

 While it is true that the Barrows could have assumed that the several properties they owned which were rented by CPI would be able to be rented to others in the event of CPI’s bankruptcy, the prospect of losing such a long time tenant as well as potential income in the form of wages or dividends from CPI caused a material adverse change to the financial condition of the Barrows.

 I do not find credible the testimony of the loan officer from Slade’s that the bank would have closed the loan in May or June of 1996 if the environmental situation had been resolved without requiring CPI to provide it with any supplemental financial data. In any event, not even the loan officer purported to have waived the requirement or to have intended to waive the requirement that there be no material adverse change between the date of the commitment letter and the closing.

 In denying the defendants’ motion for summary judgment on count III, this court found no reason why different standards should apply to real estate broker’s commissions and a commission on a bank loan. The defendants continue to maintain that the Tristam standard is inapplicable, but the notion that, where there is a binding contract between a bank and a borrower, the borrower may not wrongfully frustrate the closing of a loan on which a commission would become due at the closing imposes no greater requirement upon the borrower than does the covenant of good faith and fair dealing inherent in any contract. Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471(1991). “If the case is analyzed as one outside of the Tristam's Landing rules, governed instead by a special brokerage agreement.. . making a sale a condition of the broker’s commission, the result would not be different; for it is fundamental that a promisor may not avoid his promised performance based on the ‘nonoccurrence of a condition’ where the promisor has himself hindered or prevented its occurrence.” Lobosco v. Donovan, 30 Mass.App.Ct. 53, 56, rev. denied, 406 Mass. 1104 (1991).

 Rezendes argues that any change in the financial condition of CPI is not relevant because only the Barrows were the borrowers and the borrowers had the financial wherewithal to service the loan had it been made in the spring of 1996. That argument ignores the language of the commitment letter which he secured.
*708 The commitment letter refers to a line of credit to CPI and CPI signed the commitment letter as a borrower (not as a guarantor) just as Chester Barrows and Alice Barrows signed as borrowers. Moreover, due to CPI’s adverse changes, the financial condition of the Barrows themselves had undergone a material adverse change.

 Even if notice were required to have been given, Rezendes was told by Rau in mid-May, several weeks before the sale of CPI, that the defendants no longer were interested in obtaining financing. That was reasonable termination notice. Rezendes was not hurt by the defendants’ failure to have given notice in late March or early April when the decision first was made to seek out potential purchasers.